## In Equity.

### LOREN E. KIMBALL *vs.* NORTH EAST HARBOR WATER COMPANY et al.

### Hancock.    Opinion January 26, 1911.

*Waters and Watercourses.   Waterworks.   Domestic Use.   Regulations.   Private and Special Laws, 1883, chapter 168 ; 1907, chapter 187.*

Private and Special Laws, 1883, chapter 168, chartering a water company to supply water for "domestic" purposes, requires the company to furnish water to operate an elevator in a summer hotel ; such use not being a development of power for commercial or industrial purposes.

"Domestic" derived from "domus," a house, means "belonging to the house or household, concerning or relating to the house or family." The term has a widely varying meaning, though primarily it relates to the house or home. Its significance must be determined with reference to the subject matter and the relation in which it appears.

A water company must supply water to a consumer for a purpose contemplated by the company's charter at reasonable rates, and subject to reasonable rules and regulations.

A water company can require a consumer to so apply water as not to menace the safety, stability, or usefulness of the system, nor injuriously affect other consumers.

Evidence *held* to show that the method of a consumer's use of water in operating a passenger elevator injuriously affected the system and other consumers, warranting a discontinuance of the service on the consumer refusing to change the method.

In equity.    On report.    Bill dismissed.

Bill in equity brought by the plaintiff who was the owner of the Kimball House, a summer hotel at Northeast Harbor, wherein it was alleged, among other things, that the defendant water company and its superintendent had threatened to discontinue the supply of water for use in the operation of the elevator in said hotel unless certain changes were made in the method of applying the water, and praying for an injunction against their discontinuing the supply of water as threatened.    The defendants filed an answer with a

demurrer therein inserted, and the plaintiff filed the usual replication. The cause was then heard on bill, answer, replication and evidence, and at the conclusion of the testimony the case was reported to the Law Court for determination.

The case is stated in the opinion.

*Hale & Hamlin,* for plaintiff.

*Deasy & Lyman,* for defendants.

SITTING: EMERY, C. J., SAVAGE, PEABODY, SPEAR, CORNISH, KING, JJ.

CORNISH, J. The Northeast Harbor Water Company was chartered by special act of the legislature in 1883 "for the purpose of supplying the village of Northeast Harbor in the town of Mount Desert in Hancock county and the vicinity of said village, with pure water for domestic, sanitary and municipal purposes," and for said purposes was given the power to detain and take water from Hadlock Lower Pond in Mount Desert and from any streams flowing out of the same, Priv. L. 1883, c. 168. Under that charter a water system was constructed in 1884 and has been in operation since, supplying water now to about two hundred and fifty takers.

By Private Laws 1907, ch. 187, additional powers and rights were conferred upon the company and, to quote the words of the act, "in addition to the powers now possessed by it, it is hereby authorized and empowered . . . . . to supply water for shipping and for the development of power, to erect dams and other structures for the purpose," etc., and certain rights of flowage on Lower Hadlock pond were also granted.

The plaintiff is the owner of the Kimball House, a summer hotel at Northeast Harbor and one of the parties supplied by the defendant. In 1898 he installed in the hotel an elevator which has since been run by water power by direct pressure, the water being taken from an eight inch main in the street through a four inch pipe directly to the elevator. In December, 1908, the company notified the plaintiff that in view of the effect during the preceding years upon the water pressure in the pipes of other consumers in the

vicinity of the Kimball House, it would discontinue the supply for use in the operation of the elevator on and after April 1, 1909, unless certain changes were made in the method of applying the water, by means of a tank, so as to obviate the difficulties experienced. The plaintiff made no reply to this communication. On March 16, 1909, the defendant by letter extended the time to June 1, 1909. But the plaintiff took no steps toward making the suggested change and brought this bill in equity against the company and its superintendent asking for an injunction against their discontinuing the supply of water as threatened.

Two questions are raised :

First; the obligation of the company to furnish water under the facts of this case.

Second; the reasonableness of the company's requirements.

The first proposition has been argued only with reference to the additional act of 1907 which gave the company the right to supply water for the "development of power," and were that act under consideration, as in the eminent domain clause, serious doubts might arise under the decision of this court in *Brown* v. *Gerald*, 100 Maine, 351. We do not, however, deem it necessary in this case to consider the force or validity of that act. We think the language and spirit of the original charter are sufficiently broad to cover this case, for in that charter the company was empowered to supply water for all domestic purposes and it requires no wrenching of terms to hold that the use of water for operating an elevator in a private dwelling or in a hotel comes within the term domestic purpose in its broad and liberal sense. For what purpose is this used if not domestic? It certainly is neither a trade nor an industrial purpose. The power is not employed in manufacturing or in producing any article for sale upon the market. "Domestic" is used as the direct antithesis of commercial or industrial. The word itself, in its derivation from "domus" a house, suggests its inherent purport. It is defined as "belonging to the home or household, concerning or relating to the home or family," Standard Dic; or as Webster has it "of pertaining to one's house or home, or one's household or family." As water is furnished by a public service

corporation to private consumers it may be used in various ways, but the purpose, whatever the method, comes within these definitions of domestic. Thus it may be used for drinking, cooking, bathing, washing, toilet, heating or sprinkling. It is not the manner of the use but its purpose which is the determining test. Is it to be used for the necessity, cleanliness, health, comfort or convenience of the house and its appurtenances or of the household? If so it is a domestic purpose. And it can make no difference whether it be a private home or a hotel, which in this sense is but a larger household, a temporary home for a greater number of people. An elevator in a private house is a convenience, in a hotel is almost, if not quite, a necessity. It promotes the personal comfort of the proprietor, his family, servants and guests. It is a domestic labor saving device and the use of water in propelling such elevator would certainly seem to be embraced in the term domestic. This term has been enlarging as the wants and the needs of people have increased. Drinking, bathing and washing must at first have marked the limit; flushing came with bath rooms and steam and hot water heating and lawn sprinkling are also of a later date. In the same category belongs the elevator, which is made to do another kind of domestic work. Simply because the water is used in the form of power does not differentiate it. The purpose remains the same. Originally gas was used only for lighting. Because of inventions it is now used for heating and cooking. Can we say that the latter is not as much a domestic use as the former? So electricity was originally used in the home for lighting; now there are many additional uses, some of them employing the agency in the form of power to operate small motors for domestic purposes but all tending to the comfort and convenience of the family.

If, however, power is developed for commercial and industrial purposes, the realm of the household has been left behind. Then it is made to operate factories, to drive machinery, to manufacture products for the market. Then it is coined into money. Comfort and convenience are forgotten. Earnings and dividends are alone considered. Then the charter of 1883 would be inadequate, and the broader powers conferred by the act of 1907 would be invoked.

The interpretation which we give to the words "domestic uses," is strengthened by the fact that it is the same as that adopted by the parties themselves, because the operation of this elevator by water furnished by the defendant began in 1898, nine years before the Act of 1907 was passed. It required no additional act to authorize the supply of water for any domestic use although incidentally it might be converted into power and used in that form and the parties were correct in so viewing it.

Authorities on this subject are not numerous because the question has not often arisen.

Domestic use was held to include water in a stable for washing a private carriage and watering a private carriage horse, in *Busby* v. *Chesterfield Water Works Co.*, Ell. Bl. & Ell. 176 ; for watering a pleasure garden in *Bristol Water Works Co.* v. *Uren*, L. R. 15 Q. B. Div. 637, and running a church motor was held to come within the terms of a contract for furnishing all water needed for use in the churches in *M. E. Church* v. *Ashtabula Water Co.*, 20 Ohio, Cir. Ct. R. 578. In *City of Erie* v. *Erie Gas & Mineral Co.*, 78 Kan. 348, 97 Pac. 468, a contract was made between the city and the gas company by which the company was to pay to the city annually one-fifth of its net profits from the sale of gas to the inhabitants for domestic purposes, and in reply to the contention that a sale of gas to churches, stores, offices and opera house was not a sale for domestic purposes, the court say : "The term was probably used with reference to the ordinary distinction usually made in the sale of gas for light and heat, for the comfort and convenience of individuals in their homes, offices, stores, churches and the like, and sales made to manufacturers to generate power. Usually reductions are made for the latter purpose from the schedule of prices for the former. The term "domestic" has a widely varying meaning, and, while its primary significance relates to the house or home, it is often used in a vastly broader sense. Its significance must always be determined with reference to the subject-matter and the relation in which it appears. In this contract and with reference to this subject the more reasonable view is that it applies, not only to the homes of the city, but to other places

named, where its principal use is for heating and lighting, and not for power." In *Watson* v. *Needham*, 161 Mass. 404, an action to recover damages for failure to supply water to a steam heating plant in a greenhouse as per agreement, the defendant contended that it had no constitutional authority to take and furnish water for this purpose and that the contract was therefore void. The language of the court on this point is this: "It may be a matter of some difficulty to determine precisely what uses are included within the public purposes for which water lawfully may be taken. In regard to uses strictly domestic there can be no doubt. We are of opinion that other uses are included, such as are fairly incidental to the ordinary modes of living in cities and large towns, and as involve the operation of motors requiring but a small quantity of water which may reasonably be supplied from an aqueduct of such capacity as would be needed to meet the ordinary requirements of the inhabitants for domestic and other similar purposes. We are of opinion that the use in the present case was one for which the town might legally furnish water."

The definition given by the Supreme Court of Alabama in *Crosby* v. *City Council of Montgomery*, 108 Ala. 498, 18 So. 723, is this: "Domestic uses or purposes, of water for a family occupying a dwelling house, include all uses which contribute to the health, comfort and convenience of the family in the enjoyment of their dwelling as a home." This definition is sufficiently comprehensive to cover the case under consideration.

On this branch of the case the court is of opinion that the use of the water by the plaintiff for operating his elevator was within the term "domestic purposes" in the charter of 1883. It follows therefore, as a well established principle of law that the defendant is bound to supply water to the plaintiff at reasonable rates and subject to reasonable rules and regulations in the conduct of its business. Such rules and regulations must be neither oppressive nor vexatious. *Lumbard* v. *Stevens*, 4 Cush. 60; *Turner* v. *Revere Water Co.*, 171 Mass. 329; *Water Co.* v. *Adams*, 84 Maine, 472; *Wood* v. *Auburn*, 87 Maine, 287; *Robbins* v. *Railway Co.*, 100 Maine, 496.

This brings us to the second point involved, the reasonableness of the condition imposed by the defendant company. This condition does not concern the question of rate nor of payment nor of discrimination but the method of applying the water in operating the elevator. The company asks the plaintiff to build and maintain a tank or tanks of sufficient capacity so that the water may be taken indirectly, from the tanks, instead of directly from the main. The reason given for this is that the present method menaces the safety, stability and usefulness of the system and injuriously affects the service of other consumers in the vicinity, while the proposed plan would obviate the troubles incident upon the direct pressure including water hammer technically so called. A careful study of the evidence, which it would be unprofitable to rehearse, leads to the conclusion that the company's contention is clearly established, and, if so, no one can successfully maintain that its obligation as a public service corporation to other consumers, as well as a proper regard for the protection of its own property, does not justify it in its request.

Upon the whole case, therefore, our conclusion is that the entry should be,

*Bill dismissed with a single*
*bill of costs for defendants.*